IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr147

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | MEMORANDUM AND ORDER |
| | ) | |
| JOVAN MARQUELL McLAUGHLIN | ) | |
| | ) | |

**THIS MATTER** is before the Court on the defendant's Motions to Suppress (Doc. Nos. 16, 17), the government's Response (Doc. No. 20), and the parties' post-hearing memoranda (Doc. Nos. 21, 22). Having conducted an evidentiary hearing, for the reasons stated below, the Court will grant in part and deny in part the motions to suppress.

I.  PROCEDURAL HISTORY

The grand jury charged the defendant with violating 18 U.S.C. § 922(g)(1) for allegedly possessing a .32 caliber pistol on December 31, 2007, and a shotgun on March 22, 2008. (Doc. No. 3: Indictment). The grand jury further charged that the defendant knew the shotgun was stolen, in violation of 18 U.S.C. § 922(j). (Id.). The defendant filed motions to suppress his statements and physical evidence obtained during the encounters with police that led to the discovery of the firearms. (Doc. Nos. 16, 17). The Court conducted a hearing on the motions on November 17, 2008, during which Charlotte-Mecklenburg Police (CMPD) Officers Jeff Templeton, Brian Carey, and J.C. Wheaton testified. The defendant did not call any witnesses, but, without objection, introduced the officers' reports as exhibits. (Def. Ex. 1, 4, 5). Following the hearing, the defendant submitted a transcript of the video recording of the March incident. (Doc. No. 22: Attachment 1).

II.	FACTUAL FINDINGS

A.	December 31, 2007[1]

On December 31, 2007, at around 10:35 p.m., CMPD Officers Templeton, Cotton, and Scalise were on bike patrol uptown. At the intersection of Trade and Tryon Streets, they rode behind a white Chevrolet El Camino stopped at a red light with its nose into the crosswalk. Officer Templeton saw that its temporary tag had been issued to a BMW. The officers initiated a traffic stop, with Officer Cotton approaching the driver's side and Officer Templeton approaching the passenger's side, where the defendant was sitting. Officer Cotton asked the driver for his license, which the driver handed across the passenger seat to Officer Templeton.[2] The driver told Officer Templeton that the car belonged to the defendant. Officer Templeton asked the defendant for his license and registration, which he could not produce.

In order to determine the status of the vehicle, such as whether it had insurance, was involved in criminal activity, or was stolen, the officers decided to check the El Camino's Vehicle Identification Number (VIN). For safety reasons, they asked both the driver and the defendant to get out while they checked the VIN, located on the front of the windshield or inside the door.

After the defendant complied, Officer Templeton prepared to pat him down by instructing him to turn away. Officer Templeton placed his left hand around the defendant's

---

[1] From observing Officer Templeton, the Court finds that he was a credible witness. His testimony was internally consistent, as well as consistent with his report about the events in question. He was not impeached on cross-examination and no evidence was introduced to contradict him.

[2] Officer Templeton has never observed a driver hand his license across the passenger area when there was an officer standing beside the driver's window.

waist area, "grazing" his bulky, hooded sweatshirt, and asked the defendant if there was anything he needed to know about. The defendant responded, "Yeah, my gun. Your hand's on my gun." Officer Templeton had not yet begun the search or felt anything. He then pressed down, felt the gun, lifted up the clothing, and removed a small black handgun in the defendant's belt. Officer Templeton arrested the defendant for carrying a concealed weapon.[3]

B.   March 22, 2008[4]

On March 22, 2008, CMPD Officers Carey and Wheaton were patrolling the parking lot at Eastland Mall in a marked police car in response to thefts from cars and robberies in that area. They had a dashboard camera recording the view from the front of the car.[5] (Gov't Ex. 1). At approximately 8 p.m., they were warning another person for a handicapped-parking violation when they observed a black Lincoln Navigator backing into a handicapped spot a few spaces in front of them. The driver being warned told the officers they should investigate the occupants of the Navigator who appeared in good health, yet hung a handicapped placard on the rear-view mirror before they exited the vehicle.

---

[3] The government concedes that statements after this point were taken in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Doc. No. 20: Response at 14). Accordingly, the defendant's motion is granted as to those statements and the government is prohibited from seeking to admit them during its case-in-chief.

[4] From observing their demeanor, the Court finds that Officers Carey and Wheaton were credible witnesses. Although Officer Wheaton's testimony in an unrelated case was criticized by a magistrate judge (see United States v. Eanes, No. 3:07cr238, Doc. No. 43), the Court finds his testimony in this case to be internally consistent and corroborated by the video recording, his contemporaneous police report, and Officer Carey's testimony. The defendant presented no evidence to contradict either Officer Carey or Wheaton.

[5] Officer Wheaton was wearing a microphone device on his belt. During the initial portion of the encounter with the defendant, it was not transmitting because of a dead battery. After the defendant was arrested, Officer Wheaton noticed the problem and changed the battery, enabling the recording of audio.

Officer Wheaton approached the Navigator's passenger asked if they were handicapped or disabled. The passenger responded that they were not. At the same time, Officer Carey walked after the defendant, who had been driving the Navigator. The defendant had gone around the back of the vehicle and was walking quickly toward the mall. Officer Carey followed the defendant, calling out several times to get his attention. The defendant stopped on the sidewalk, approximately thirty feet from the Navigator and turned around. Officer Carey asked if he was handicapped. When the defendant responded that he was not, Officer Carey asked him if he would mind coming back to the vehicle to determine whether a ticket would be issued or the vehicle towed.

Officer Wheaton patted down the passenger who was calm and cooperative and provided his identification when requested. Officer Carey patted down the defendant who appeared nervous and, based on the officer's experience, was looking around for a way of escape.[6] He asked for the defendant's name and driver's license. The defendant did not have a license with him and only gave the name "Jovan." While Officer Carey was asking the defendant several times for his last name, the defendant began using his cell phone, apparently to send a text message. The defendant ignored Officer Carey's requests to stop using the phone and to provide his last name.

In Officer Carey's experience, individuals had used cell phones to summon others to come and interfere with police operations. He had also received training to seize a cell phone apparently being used for that purpose. Based on this concern, Officer Carey reached for the phone. The defendant backed away, held the phone away, and apparently activated a camera

---

[6] No physical evidence was found during the pat-down.

function on the phone.[7] Officer Wheaton moved in to assist handcuffing the defendant who was struggling with Officer Carey. Eventually, the phone fell to the ground and Officer Carey arrested the defendant for hindering their investigation of the handicapped-parking offense, driving without a license, and refusing to provide his name. The officers did not read him Miranda rights, but did not question him at that time.

After they placed the defendant in the patrol car, Officer Carey went to the Navigator and saw that its temporary tag was issued to a Jeep. He ran the VIN and learned it was reported stolen. The passenger was then handcuffed and placed in a second police car. Officer Carey removed the defendant from the first police car and searched him more completely. During this search, the defendant made a spontaneous statement that his cousin, the passenger, did not know anything about the vehicle or what was inside it. Officer Carey found a single key on the defendant and used it to open the Navigator. Inside, Officer Carey found a camouflage-colored shotgun in the back, along with laptop computers, a global positioning system unit, and tools like those used in thefts from cars. When Officer Carey checked the serial number of the shotgun, he learned that it was stolen.

A mall security guard spoke to the defendant through the rear window of the police car. Officer Wheaton overheard the conversation while sitting in the driver's seat. In Officer Wheaton's experience, individuals involved in offenses from shoplifting to more serious crimes are banned from the property so that problems do not reoccur. When the security guard told the defendant that he was banned from the property, the defendant responded with attitude and words to the effect that the guard could talk to the defendant's lawyer about that. Officer

---

[7] The defendant commented during the struggle that he had the officers on tape.

Wheaton later discussed with his captain whether this comment amounted to an invocation of the defendant's right to counsel; they decided it did not.

After inventorying the car, both officers participated in a full, final search of the defendant. Officer Carey had no involvement or interaction with either suspect after that. Instead, after discussing the case with other officers for several minutes, Officer Wheaton brought the passenger into the same police car as the defendant.[8] Officer Wheaton advised them of their Miranda rights and asked whether they understood their rights. Both the defendant and the passenger answered affirmatively. Neither asked for a lawyer or refused to answer questions.

Officer Wheaton offered that if the person who stole the vehicle, shotgun, and other items took responsibility, the other could go. Otherwise, both were going to be charged. Officer Wheaton said he would give them a minute to think about it, but the defendant said he didn't need to think about it, that he would go "downtown," and that the passenger had nothing to do with it. Officer Wheaton responded, "Okay, well how do I know he didn't?" At approximately 19:58:01 according to the time on the video, the defendant said, "My lawyer takes care of that." The passenger insisted that he did not steal anything, which the defendant confirmed. The

---

[8] At this point in the encounter, the audio begins to record. The defendant submitted a transcript prepared by an employee of the Community Defender's Office. (Doc. No. 22: Attachment 1). From the Court's review of the recording and the transcript, the Court finds that the transcript contains numerous errors and omissions, which the Court attributes to difficulty in hearing the recording. For example, in the portion where Officer Wheaton tells his captain that if the defendant asked for a lawyer from the mall security guard that it would not affect the police investigation, the transcript interprets the next line as, "I'd just like to stick to the plan though. [inaudible]." (Id. at 5). The Court finds the captain's response to be, "That's not [inaudible] to us. They just take their picture to ban them, to keep up with them. He'll just get it off the website." The captain's response is consistent with Officer Wheaton's testimony that when the security guard told the defendant he was banned from the mall, the defendant told the guard to speak to his attorney about that. Because of this and other errors throughout, the Court finds the transcript is unreliable and does not provide an accurate account of the audio recording.

exchange continued with Officer Wheaton seeking specific information about who stole the car, the computer, and the gun and the defendant generally "taking responsibility" and saying he would "go downtown." The passenger confronted the defendant to get him to admit he stole the gun and that he was not going to court for the defendant. At approximately 20:00:24, the defendant stated that he had a lawyer and that he did not agree with this. He then asked Officer Wheaton to come talk to him. Officer Wheaton agreed to come over to the defendant's side of the car. The defendant said, "Like I said, I'll take the responsibility. If you can't handle that, you can write up the paperwork. I can't go no further than that." Officer Wheaton responded that he would take both of them and exited the car.

When Officer Weaton returned to the car a couple minutes later, the defendant and the passenger had heated exchanges, during which the passenger pressed the defendant to answer the officer's questions so he could be released. Officer Wheaton stressed that the "deal" he was offering to let the passenger go was about to expire. The defendant then admitted taking responsibility for the stolen car, gun, and laptop. The passenger was released. On the way to the police station, the defendant asked Officer Wheaton how he could put a man in a situation to make him talk about something he did not have anything to do with. He accused the officer of making him say things just to let the passenger out of the police car. At the police station, Officer Wheaton offered the defendant the chance to cooperate with a police investigation into stolen items. When the defendant requested his lawyer, Officer Wheaton terminated the interview.

III. LEGAL DISCUSSION

    A. December 31, 2007

Regarding the pistol discovered on the defendant's person on December 31, 2007, the defendant argues that he was arrested without probable cause when he was ordered to exit the El Camino in which he was a passenger. He further alleges that the pat-down search was not justified under the circumstances.

An officer may temporarily detain a person that he reasonably believes is involved in criminal activity. Terry v. Ohio, 392 U.S. 1, 30 (1968). During a Terry stop, an officer may ask a limited number of questions without giving Miranda warnings. Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984). When such a stop involves a vehicle, an officer may order a passenger to exit the vehicle as a matter of course without any particular showing of dangerousness. Maryland v. Wilson, 519 U.S. 408, 414-15 (1997); United States v. Soriano-Jarquin, 492 F.3d 495, 500 (2007). An officer may conduct a brief search for weapons when he has reason to believe he is dealing with an armed and dangerous person, regardless of whether probable cause exists to arrest him for a crime. Terry, 392 U.S. at 27.

Here, Officer Templeton observed that the temporary tag on the El Camino had been issued to a BMW. Therefore, he was justified in conducting a traffic stop to investigate the offense of displaying an improper tag. State v. Johnson, 651 S.E.2d 907, 908 (N.C. Ct. App. 2007). When the defendant could not produce a registration for the vehicle, the officers properly continued to investigate whether the vehicle was stolen by checking the VIN. Officer Templeton's choice to have the defendant exit the vehicle for officer safety did not amount to a custodial arrest: he was not placed in handcuffs, told he was under arrest, or removed from the

scene. Accordingly, Officer Templeton's question before beginning a pat-down search for weapons about whether there was anything he needed to know about did not implicate the defendant's Fifth Amendment rights. The defendant's response that the officer's hand was on the defendant's gun provided a reasonable basis to believe he was armed and dangerous.[9] Therefore, Officer Templeton was justified in then searching the defendant for the gun, and that evidence will not be suppressed.

B. March 22, 2008

Regarding the shotgun found in the Lincoln Navigator the defendant had been driving on March 22, 2008, the defendant seeks suppression of that evidence on the basis that there was no justification to detain him after he parked in a handicapped spot. He further asserts that the Miranda warning was insufficient and that Officer Wheaton continued to question him after he invoked his right to counsel.

1. Legitimate Expectation of Privacy

Before a defendant can challenge a police search, he must establish a legitimate expectation of privacy in the place searched. United States v. Salvucci, 448 U.S. 83, 91-92 (1980). The Fourth Circuit has applied that decision to hold that a defendant knowingly in possession of a stolen automobile may not object to its search. United States v. Hargrove, 647 F.2d 411, 412 (4th Cir. 1981). Here, the defendant has failed to carry his burden to show that he possessed the Navigator innocently. The evidence presented at the hearing showed that the SUV

---

[9] The Court credits Officer Templeton's testimony that he had not felt the gun when the defendant described the officer's hand as being on the gun. Given the defendant's bulky, hooded sweatshirt and the slight touching by the officer, the Court finds that no search began until after the defendant made his statement.

9

had been reported stolen and that it was bearing a fraudulent temporary tag. Therefore, the defendant's challenge to Officer Carey's finding the shotgun and other items in the Navigator fails on that basis alone.

    2.    Evidence in Navigator

Alternatively, the defendant's motion to suppress evidence found in the Navigator fails on its merits because exceptions to the warrant requirement justified searching the SUV. As detailed above, under Terry, an officer may detain a person when it appears that a criminal offense is occurring in his presence. An officer need not rule out every innocent explanation before arriving at reasonable suspicion to investigate. United States v. Black, 525 F.3d 359, 365 (4th Cir. 2008). In North Carolina, it is an offense to park in a spot reserved for handicapped persons without authorization and to display a handicapped placard without being qualified for that privilege. N.C. Gen. Stat. § 20-37.6(e) (2005). Local police officers are authorized to enforce the statute on private property and may have illegally parked vehicles towed. Id. § 20-37.6(f).

After observing a traffic violation, an officer is permitted to detain the driver to issue him a citation and confirm that he is permitted to drive the vehicle. United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008). Included in that process is the ability to request a driver's license and vehicle registration. Id. at 335. When a driver obstructs such an investigation by providing inaccurate information, a longer stop is reasonable. Id. at 336.

The statute which makes it unlawful to resist an arrest, North Carolina General Statute § 14-223, also proscribes "any resistance, delay, or obstruction of an officer in the discharge of his duties." State v. Washington, — S.E.2d — (N.C. Ct. App. 2008) (quoting State v. Lynch, 380

10

S.E.2d 397, 398 (N.C. Ct. App. 1989)) (internal quotation marks omitted). Additionally, a person can be arrested in North Carolina for driving without a license. State v. Bailey, 662 S.E.2d 36, at *6 (N.C. Ct. App. June 3, 2008) (unpublished). When a recent occupant of a vehicle is arrested, an officer may thoroughly search his person and the passenger compartment of the vehicle incident to that arrest. Thornton v. United States, 541 U.S. 615, 623-24 (2004). A vehicle may also be searched without a warrant if there is probable cause to believe that it contains evidence of a crime. United States v. Collins, 412 F.3d 515, 518 (4th Cir. 2005) (citing California v. Carney, 471 U.S. 386, 390-91 (1985)). If a vehicle is to be towed and impounded, police may conduct a routine inventory search without a warrant. United States v. George, 971 F.2d 1113, 1121 (4th Cir. 1992).

Here, Officers Carey and Wheaton observed the defendant back the Navigator into a handicapped parking spot near to them and display a handicapped placard. It did not appear to the officers and the driver being warned that the defendant or his passenger were disabled. The passenger confirmed to Officer Wheaton that they were not handicapped. Therefore, Officer Carey was justified in briefly detaining the defendant to investigate whether he was authorized to park in the handicapped spot and drive the Navigator. Officer Carey was not required to exclude every innocent explanation for the defendant's conduct before stopping him, such as observing whether he was there to pick up a disabled person.

As part of that investigation, Officer Carey properly requested the defendant's name and driver's license. When the defendant refused to provide his last name, continued to use his cell

phone during the encounter when requested not to do so,[10] and did not provide a driver's license, Officer Carey lawfully arrested him for hindering an officer in the performance of his duties and for driving without a license. The Navigator which the defendant had just exited was lawfully searched incident to his arrest. Additionally, the defendant's spontaneous statement when he was being searched for a key to the SUV that his cousin had nothing to do with the vehicle or its contents provided probable cause to search it for evidence of a crime. Even if the defendant had not been detained or arrested, Officer Carey would have discovered the improper tag and stolen vehicle report in the course of issuing a citation or having the vehicle towed for the handicapped-parking violation. The officers would have had the authority to inventory the contents of the stolen SUV before it was towed. Therefore, their search of the Navigator was justified by exceptions to the warrant requirement, and the evidence found inside will not be suppressed.

       3.       Post-Arrest Statements

The defendant alleges that Officer Wheaton improperly advised him of his <u>Miranda</u> rights because he did not specifically ask if the defendant was willing to waive his rights and answer questions. The defendant also claims that Officer Wheaton continued to question him after he invoked his right to counsel.

The government bears the burden of proving by a preponderance of the evidence that any statements were knowingly and voluntarily made. <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972). To admit statements made by a person while in custody, the government must show that he was advised of his right against self-incrimination and his right to counsel. <u>Miranda v. Arizona</u>, 384

---

[10] Based on Officer Carey's training and experience, it was reasonable for him to believe that the defendant might have been using the cell phone to obstruct the investigation.

U.S. 436, 444 (1966). An officer is free to question a person who does not invoke his rights after being advised about them. United States v. Cardwell, 433 F.3d 378, 389 (4th Cir. 2005). Thus, the defendant's assertion that an officer is required to ask if the person is willing to waive his rights and answer questions is incorrect. When a person indicates that he wants to consult with a lawyer or that he does not want to answer questions, interrogation must cease. Miranda, 384 U.S. at 444-45. However, a person's invocation of his right to counsel must be clear and unambiguous. Davis v. United States, 512 U.S. 452, 459 (1994).

A court must consider the totality of the circumstances to determine whether the person understood his rights and exercised an uncoerced choice to waive them. Moran v. Burbine, 475 U.S. 412, 421 (1986). The totality of the circumstances includes the setting in which the statement was obtained, details of the interrogation, and characteristics of the accused. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The ultimate question is whether "the defendant's will has been overborne or his capacity for self-determination critically impaired." United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (internal quotation marks and citations omitted).

Here, the defendant made a spontaneous statement after his arrest, but before receiving Miranda warnings. His statement that his cousin, the passenger, had nothing to do with the vehicle or anything inside of it was not in response to police interrogation; therefore, it is admissible in the government's case-in-chief.

As confirmed by the recording at approximately 19:56:28 on the video clock, Officer Wheaton properly advised the defendant of his Miranda rights, which the defendant said he understood without asking any questions. The defendant's arrest report referenced by the

officers on the scene revealed a lengthy criminal history. The defendant later specifically invoked his right to counsel when interviewed at the police station. Therefore, the Court finds that he understood his Miranda rights.

The defendant did not in any way indicate that he wanted to speak to a lawyer or would refuse to answer questions at the beginning of the interview. The Court finds that Officer Wheaton's initial offer to let one person go if the responsible person confessed was not, by itself, coercive. In fact, the defendant immediately declined the officer's invitation to think about what he wanted to say and agreed to "go downtown" because the passenger had nothing to do with it. He had already made a similar statement before any questioning began.

When Officer Wheaton asked the defendant how he could know that the passenger did not steal the shotgun or the car, the defendant responded, "My lawyer takes care of that." The Court finds that reference to having a lawyer and his direction to the mall security guard to speak to his lawyer about being banned from the property were not invocations of his right to counsel. Neither of these statements unambiguously indicated that he wished to consult with counsel before questioning about the SUV, shotgun, and other items.

For approximately the next five minutes, the defendant continued to admit his responsibility generally and exonerate his cousin, but refused to admit that he stole particular items. During that time, Officer Wheaton made at least five separate statements threatening to take both of them to jail if the defendant did not specifically admit what he stole. The passenger became more and more agitated and pressed the defendant to tell the officer that the defendant stole the items so the passenger could be released. At approximately 20:00:24 on the video clock, the defendant began to signal his unwillingness to answer further questioning by saying,

"I have a lawyer. I don't agree with this." At approximately 20:01:12, the defendant went on to say that he could not go further than to say he took responsibility and if that was not enough, the officer could write up the paperwork. The Court finds that in the totality of the circumstances, the interview should have ceased at that point.

Instead, the questioning continued combining the coercive elements of the passenger imploring the defendant to confess so that he could be released and Officer Wheaton repeating that absent a specific confession he was taking the two of them to jail and that the "deal" was about to expire. Although the defendant had not clearly invoked his right to counsel, he had mentioned his lawyer in the context of not agreeing with the interrogation. Officer Wheaton's offer to let the innocent person go, upon repetition and in conjunction with intense pressure from the passenger, eventually critically impaired the defendant's ability to determine his actions for himself. It is telling that soon after the passenger was released, the defendant accused Officer Wheaton of making him say something just to let his "partner" out of the car. Accordingly, the Court finds that the defendant's statements after 20:01:20 on the video clock were not voluntary and are not admissible in the government's case-in-chief.

IV. CONCLUSION

In considering the evidence offered at the hearing, the Court finds that the physical evidence was lawfully found by the police. As detailed above, some of the statements were taken in violation of the defendant's Fifth Amendment rights and are not admissible in the government's case-in-chief.

**IT IS, THEREFORE, ORDERED** that the defendant's Motions to Suppress (Doc. Nos. 16, 17) are **GRANTED in part** and **DENIED in part**.

Signed: December 3, 2008

Robert J. Conrad, Jr.
Chief United States District Judge